[Cite as *In re C.G.V.*, 2024-Ohio-789.]

# IN THE COURT OF APPEALS OF OHIO
## ELEVENTH APPELLATE DISTRICT
## PORTAGE COUNTY

IN THE MATTER OF:

C.G.V. AND J.B.,
DEPENDENT CHILDREN

**CASE NOS. 2023-P-0085**
**2023-P-0086**

Civil Appeals from the
Court of Common Pleas,
Juvenile Division

Trial Court Nos. 2021 JCC 00255
2021 JCC 00256

## O P I N I O N

Decided: March 4, 2024
Judgment: Affirmed

*Benjamin J. Plough*, 221 South Freedom Street, Ravenna, OH 44266 (For Appellant, Shannon L. Rhoads).

*Victor V. Vigluicci*, Portage County Prosecutor, and *Theresa M. Scahill*, Assistant Prosecutor, 241 South Chestnut Street, Ravenna, OH 44266 (For Appellee, Portage County Department of Job and Family Services).

*Gerrit denHeijer*, Giulitto Law Office, 222 West Main Street, P.O. Box 350, Ravenna, OH 44266 (Guardian ad litem).

*Sarah G. Ogden,* Megargel, Eskridge, & Mullins, LLP, 231 South Chestnut Street, Ravenna, OH 44266 (For Minor, C.G.V.).

ROBERT J. PATTON, J.

{¶1} Appellant, Shannon Rhoads ("Mother"), appeals the order of the Portage County Court of Common Pleas, Juvenile Division, granting permanent custody of her

minor children, C.G.V. and J.B., to Portage County Department of Jobs and Family Services ("PCDJFS").

{¶2} Mother is the biological mother of C.G.V. (born 03/12/2015) and J.B. (born 09/06/2020). During the pendency of this case in the trial court, a paternity test established that Justin A. Brown ("Brown") is the biological father of J.B. Mother is legally married to Joshua Vitrano ("Vitrano"), who is the biological father of C.G.V., but Mother does not currently communicate with him. Paternity was established for C.G.V. through marriage. Neither Brown nor Vitrano appealed the termination of their parental rights.

{¶3} On May 12, 2021, C.G.V. and J.B. were removed from the home of Mother, after she tested positive for fentanyl, THC, and amphetamine.[1] At the time of removal, C.G.V. was six years old and J.B. was under 12 months of age.

{¶4} The complaint filed by PCDJFS on May 13, 2021 alleged that C.G.V. and J.B. were abused, neglected, and dependent children. A case plan was filed on June 1, 2021. The children were adjudicated dependent on June 4, 2021. A dispositional hearing was held, and temporary custody was granted to PCDJFS on July 26, 2021. A motion for a six-month extension of temporary custody was filed, granted, and then a second motion for a six-month extension was filed on October 25, 2022. That motion was also granted. By April 25, 2023, when PCDJFS filed for permanent custody, the children had remained in the temporary custody of PCDJFS for 23-consecutive months.

{¶5} A permanent custody hearing was held on September 22, 2023. The following facts were presented at the hearing:

---

[1]. J.R. (born 07/08/2005) was also removed from the home. J.R. has since aged out of the system and is not subject to the order on appeal.

Case Nos. 2023-P-0085 and 2023-P-0086

{¶6} Matthew Levitas ("Mr. Levitas"), a toxicologist employed at Forensic Fluids Laboratories, testified that his facility processed Mother's drug screens from May 2021 through July 2023. His facility processed a total of 18 screens, ten of them being positive, and eight of them being negative. Mr. Levitas testified that Mother tested positive on: (1) May 4, 2021, for amphetamine, methamphetamine, THC, and fentanyl; (2) July 1, 2021, for amphetamine and methamphetamine; (3) July 13, 2021, for amphetamine and methamphetamine; (4) August 11, 2021, for amphetamine, methamphetamine, and fentanyl; (5) August 23, 2022, for amphetamine and methamphetamine; (6) October 19, 2022, for amphetamine, methamphetamine, and THC; (7) November 7, 2022, for THC; (8) February 8, 2023 for THC; (9) May 1, 2023 for THC; and, (10) July 17, 2023 for amphetamine and methamphetamine. Mr. Levitas testified that Mother's screens were oral fluid screens, where the window of detection for amphetamine and methamphetamines is approximately 72 hours.

{¶7} Kodie McCully ("Mr. McCully"), a Chemical Dependency Counseling Assistant at Town Hall II, testified he has been working with Mother for the past two-and-a-half to three years. Mr. McCully testified that he worked with Mother co-facilitating an IOP, while she was in Horizon House.[2] He testified that Mother was in Horizon House twice, and the second time she was there she was close to completion. She had been there six or seven weeks, but she left the house through a window and was dismissed.

{¶8} Mr. McCully stated that it was a significant accomplishment for Mother to come into Horizon House the second time on her own, without being court ordered, and that it was rare for a patient to re-admit themselves. He testified that Mother has been

---

2. IOP stands for "Intensive Outpatient Treatment."

Case Nos. 2023-P-0085 and 2023-P-0086

much more engaged during her second visit to Horizon House. Mr. McCully testified the success rate of anyone completing Horizon House is around 40 percent. Mr. McCully asserted that once one is dismissed, one typically cannot return, and there is only one other treatment center similar to Horizon House locally. That center usually has a waiting list. Mr. McCully observed that most people do not maintain sobriety attending Horizon House the first time. Instead, it takes at least a second opportunity and that odds for maintaining sobriety increase at that point.

{¶9} Mother also testified at the hearing. She stated that she remembers becoming involved with PCDJFS in 2021 but did not remember the details of the case plan objectives assigned to her. Mother testified "I never got the whole printout, like the whole case plan. I never did get the full thing. * * * I had to go to detox and I had to do - - I don't remember all of them, but get through drug treatment or have an assessment done and have a mental assessment done." Mother testified that she first engaged in detox in 2021 with First Step Recovery "four days after my kids were taken." Mother testified that she was there for four days. She left after four days because she thought she could complete detox on her own. She testified that her engagement with Town Hall II for IOP was "on and off. * * * I never really completely stopped. * * * I went back to the Horizon House in July * * * [for] four or five weeks * * *." Mother stated she left Horizon House before being unsuccessfully discharged because she broke a rule and left a window open. She explained she engaged in IOP three times between the time her children were removed to the date of the hearing. Mother was unsuccessfully discharged two of those three times. At the time of the hearing, Mother was engaged in IOP for one week

4

{¶10} Mother testified that her only employment since May of 2021 was "under-the-table" employment doing odd jobs. Mother testified that she had $1,500.00 in savings but was not employed. Mother said that she has consistently attended visits with the children every two weeks, for two hours at a time. Mother also stated she has only cancelled visits early in the children's removal when she experienced car trouble. Mother testified that during visits with her sons they play games, paint, and make crafts.

{¶11} Kate Miley ("Ms. Miley") from Place of Peace, where visitation is held, testified about Mother's visits with her children. Ms. Miley testified that though C.G.V. became frustrated and angry with Mother during the visits over the past two years, Mother had started managing his behaviors better. Ms. Miley testified that during the September 6, 2023 visit with Mother, C.G.V. became upset because she was trying to take something away from him. He hit Mother several times and the staff had to intervene. Ms. Miley testified that she had to stop giving a ten-minute warning signaling the ending of the visits in front of C.G.V. because it escalated his behavior.

{¶12} Ms. Miley testified that Vitrano attended two visits at Place of Peace.[3] Although they interact positively, she stated that CGV's father would make promises he does not keep. In regards to J.B., Brown also had two visits. Ms. Miley testified that Mother has been consistent with most of her visitation with C.G.V. and J.B., and only canceled one visit in the last year. Several other visits were canceled by other individuals. Mother was given the opportunity to make up those canceled visits, so long as the schedule allowed it.[4]

---

3. The judgment entry states that Vitrano visited the child five times.
4. The GAL report, filed with the trial court on August 9, 2023, and referenced in the August 16, 2023 order, states that the GAL reviewed all of the records from this family's supervised visits, and that through July 17,

5

Case Nos. 2023-P-0085 and 2023-P-0086

{¶13} Mya Clemons ("Ms. Clemons"), C.G.V.'s counselor, testified she began seeing C.G.V. monthly in 2021, then twice a month, and now sees him weekly. Ms. Clemons testified that C.G.V.'s aggressive behavior and lying have increased recently and attributes it to being in foster care and some recent difficult visits with Mother.

{¶14} Joh'Vonnie Mosely ("Ms. Mosely") is a social worker who worked with Mother while employed at PCDJFS. Ms. Mosely stopped working on Mother's case in May of 2022. Ms. Mosely testified that C.G.V. was doing better in his placement with counseling and treatment for ADHD, and J.B. was developmentally on track and thriving in his placement. The children are placed together with the same foster parents.

{¶15} Kimberly Kitchen ("Ms. Kitchen"), another caseworker who worked with Mother during the pendency of her case, testified that she took over Mother's case in May of 2022. Ms. Kitchen testified that she met with C.G.V. and J.B., and the foster parents, and that they all seemed to have a close bond. The foster parents have enrolled C.G.V. in swimming lessons and a Christian camp. Also, J.B. has started school. Ms. Kitchen testified that she met with Mother in June of 2022, and at that point, Mother had not completed any of the objectives of her case plan. Ms. Kitchen testified Mother has had the same housing in Streetsboro throughout the pendency of her case.

{¶16} Ms. Kitchen testified that both children have a close bond with Mother. Although, because of C.G.V.'s behaviors during visits, and because of J.B.'s young age, J.B. would often play independently while Mother directed her attention to C.G.V. Ms. Kitchen testified Vitrano has a bond with him, but C.G.V.'s bond is more like a friendship

---

2023, Mother attended 60 visits with the children. 31 visits were cancelled. Of those 31, 15 were attributed with the visitation center, illness of the children, or conflicts with the children's schedules. The GAL report states that Mother's cancelled visits were due to illness or transportation.

Case Nos. 2023-P-0085 and 2023-P-0086

than a bond with a parent. Ms. Kitchen testified she never saw J.B.'s biological father interact with J.B. Ms. Kitchen also testified that Brown had no contact with J.B. prior to the case, and during the pendency of the case has been incarcerated. She testified J. B. has no bond with his biological father.

{¶17} Ms. Kitchen testified the children do not have a bond with any other maternal or paternal relatives. Ms. Kitchen testified in regards to Mother's case plan, that Mother completed the required parenting assessment and has maintained appropriate housing. Mother had not completed any other case plan objectives. Specifically, Mother did not obtain employment and did not complete any of the treatment or recommendations that were a result of the mental health and substance abuse assessments. Ms. Kitchen also testified that Mother's sobriety has been inconsistent and her last positive screen for the agency was in July 2022. She testified that Mother has refused at least three drug screens; one in June of 2022, and two in August of 2022.

{¶18} Ms. Kitchen testified that Vitrano got out of prison in November of 2022. She testified Vitrano threatened her during a phone call about C.G.V.'s behavior where he said "Kim, don't make me pull up on you * * *." Ms. Kitchen testified that Vitrano began hollering at her and she hung up on him. Ms. Kitchen testified that at the time of the permanent custody hearing, Vitrano had a warrant for disorderly conduct and was currently on probation for a drug charge.

{¶19} Ms. Kitchen testified that she believes it is in the best interests of the children that they remain in the permanent custody of their foster placement and that returning the children to Mother, or to either biological father, would not be a safe for the

7

Case Nos. 2023-P-0085 and 2023-P-0086

children. She further testified that none of the parents have remedied the conditions that led to the children's removal.

{¶20} Gerrit denHijer, the Guardian ad Litem ("the GAL") testified that he met with C.G.V. two times during the pendency of this case. He testified that the first visit was at the beginning of the case, when C.G.V. was young. He felt C.G.V. was too immature to express a desire regarding his placement. The second visit was at the conclusion of the case when C.G.V. was older. On both occasions C.G.V. expressed a desire to go home with Mother. The GAL testified he never observed any interactions between Mother and C.G.V. He reviewed visit notes from the Place of Peace, after receiving the notes in July of 2023. The GAL testified he believed that when the discussion of permanency was broached with C.G.V. is when his negative behaviors began. The GAL testified that severing a relationship with Mother is a contributing factor to C.G.V.'s behaviors. The GAL testified that he did not believe it was in the best interests of the children to be returned to Mother.

{¶21} Neither Vitrano, father of C.G.V., nor Brown, father of J.B., appeared at the September 22, 2023 permanent custody hearing. However, Vitrano was represented by counsel at the hearing.

{¶22} On September 27, 2023, PCDJFS was awarded permanent custody of C.G.V. and J.B.

{¶23} Mother appeals and raises the following assignment of error: "The trial court's order granting permanent custody to the agency was not based upon sufficient, clear and convincing evidence, was against the manifest weight of the evidence, and it erred in finding permanent custody to be in the best interest of the child."

8

{¶24} "Termination of parental rights has been described as 'the family law equivalent of the death penalty.' (Citations omitted.) *State v. Hoffman*, 97 Ohio St.3d 92, 2002-Ohio-5368, 776 N.E.2d 485, ¶ 14. However, "[t]he rights of a parent to his or her child, while fundamental, 'are always subject to the ultimate welfare of the child.'" 33, (Citation omitted.) *In re. L.M.R.*, 11th Dist. Lake No. 2016-L-096, 2017-Ohio-158, ¶ 33, citing *In re Cunningham*, 59 Ohio St.2d 100, 105, 391 N.E.2d 1034 (1979). "[T]he termination of the rights of a natural parent should occur as a last resort, * * * when necessary for the welfare of the child. *Id.*

{¶25} The Supreme Court of Ohio recently clarified the standard of review for permanent custody cases under R.C. 2151.414 in *In re Z.C.*, --- Ohio St.3d ----, --- N.E.3d ----, 2023-Ohio-4703, ¶ 7, 11:

> Under R.C. 2151.414(B)(1), a juvenile court may grant permanent custody of a child to the agency that moved for permanent custody if the court determines, "by clear and convincing evidence, that it is in the best interest of the child" to do so and that one of five factors enumerated in R.C. 2151.414(B)(1)(a) through (e) applies. "Clear and convincing evidence is that measure or degree of proof which is more than a mere 'preponderance of the evidence,' but not to the extent of such certainty as is required 'beyond a reasonable doubt' in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus.
>
> * * *
>
> Given that R.C. 2151.414 requires that a juvenile court find by clear and convincing evidence that the statutory requirements are met, we agree with those appellate courts that have determined that the sufficiency-of-the-evidence and/or manifest-weight-of-the-evidence standards of review are the proper appellate standards of review of a juvenile court's permanent-custody determination, as appropriate depending

9

on the nature of the arguments that are presented by the parties.

{¶26} The Court further explained that:

> But "even if a trial court judgment is sustained by sufficient evidence, an appellate court may nevertheless conclude that the judgment is against the manifest weight of the evidence." *Eastley* at ¶ 12. When reviewing for manifest weight, the appellate court must weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered. Id. at ¶ 20. "In weighing the evidence, the court of appeals must always be mindful of the presumption in favor of the finder of fact." *Id.* at ¶ 21. "The underlying rationale of giving deference to the findings of the trial court rests with the knowledge that the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984).

*Z.C.* at ¶ 14.

{¶27} As noted above, R.C. 2151.414 requires that two prongs are met: "(1) that one of the circumstances set forth in R.C. 2151.414(B)(1)(a) through (e) is present, and (2) that it is in the best interest of the child to grant permanent custody to the agency moving for custody. R.C. 2151.414(B)(1)." *In the Matter of G.C.M.G.*, 11th Dist. Portage Nos. 2023-P-0024, 2023-P-0025, 2023-Ohio-3018, ¶ 24.

{¶28} R.C. 2151.414(B)(1)(a) through (e) states:

> (a) The child is not abandoned or orphaned, has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period if, as described in division (D)(1) of section 2151.413 of the

10

Case Nos. 2023-P-0085 and 2023-P-0086

Revised Code, the child was previously in the temporary custody of an equivalent agency in another state, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.

(b) The child is abandoned.

(c) The child is orphaned, and there are no relatives of the child who are able to take permanent custody.

(d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state.

(e) The child or another child in the custody of the parent or parents from whose custody the child has been removed has been adjudicated an abused, neglected, or dependent child on three separate occasions by any court in this state or another state.

{¶29} Here, the trial court found that the children were adjudicated dependent on June 4, 2021 based on the need for services to address substance abuse within the family. A case plan was adopted and made binding on the parties. The children were placed into temporary custody of PCDJFS. The trial court found that the children were in the temporary custody of PCDJFS for more than 12 months during a consecutive 22-month period, satisfying prong one of the statutory requirements.

{¶30} The trial court, in its order, articulated its reasoning for finding permanent placement in the best interests of the children. The trial court found that neither father have maintained contact with their children. Neither child has a bond with their fathers.

11

Case Nos. 2023-P-0085 and 2023-P-0086

Neither father appeared for the court proceedings. While Vitrano was represented by counsel, he did not have any contact with his counsel. The court found that the children have a bond with Mother, and that she has consistently visited both children. The trial court acknowledged that C.G.V. has expressed a desire to live with his mother and has exhibited anger at his mother for failing to take the necessary steps to come home. The trial court found the children have a strong bond with their foster parents and they have lived with them for over two years. The trial court found that the children have developed a bond with their "foster" grandparents, and that both children are involved in activities, and are receiving medical and emotional support from their foster placement.

{¶31} The trial court found that the GAL recommended that the children be placed in permanent custody of PCDJFS for adoption.[5] The trial court determined that C.G.V. and J.B. had been in PCDJFS' temporary custody for 26-consecutive months, and that they are in need of a stable, secure, and loving home, and there are no appropriate relatives who are available to take custody of them.

{¶32} The trial court found that reunification was unlikely because both parents refused to complete their case plan. The trial court determined that though Mother had taken steps to get treatment, it was not enough to outweigh C.G.V.'s and J.B.'s need for permanent placement. The trial court found that Vitrano did not establish a relationship with C.G.V. and has outstanding warrants. The trial court found that the parents have

---

5. On August 8, 2023, the GAL filed a Notice to Court of conflict in his reports, where he initially stated C.G.V. was too young to express a wish as to custody, and later C.G.V. expressed a clear bond with his mother. The trial court noted in its decision to grant permanent custody that appropriate weight was given to the GAL's testimony as the GAL fell below minimum standards required of Ohio Sup.R. 48, requiring that the GAL observe the child with each parent and visit the child where they reside. The GAL was appointed on May 13, 2021, but never observed any of the visits between the C.G.V. and his parents, and he visited C.G.V. two times.

Case Nos. 2023-P-0085 and 2023-P-0086

failed to remedy the conditions causing the children to be removed from the home. PCDJFS has made reasonable efforts to prevent continued removal from the home and made intensive efforts to locate a kinship caregiver. The trial court found these facts to satisfy prong two of R.C. 2151.414's requirements.

{¶33} The trial court clearly and convincingly found sufficient, credible evidence that met the statutory requirements of R.C. 2151.414. Testimony provided at the permanent custody hearing demonstrated that while Mother has recently made some progress towards meeting her case plan goals, she has not met most of her case plan objectives. Mother's attempts at Horizon House, though close to completion, ended because Mother either left on her own or was asked to leave for breaking rules. While Mother has taken positive steps towards successful sobriety, at the time of the permanent custody hearing, she had only been engaged with a new IOP for one week. Mother's substance abuse is the predominant reason for the removal of her children, and she has not taken substantial steps to gain control of her substance abuse. Mother has not obtained employment to provide financial support and stability for the children. The social workers and GAL testified that the children are thriving in their placement with their foster parents, are involved in activities, and have bonded with their foster parents.

{¶34} The trial court acknowledged the children's bond and desire to be with Mother were outweighed by the lack of Mother's ability to provide a secure and stable home for the children and their need for permanency. Sufficient evidence was produced to support the trial court's decision, and giving deference to the trier of fact, we cannot say that the trial court clearly lost its way and created a manifest miscarriage of justice.

13

Case Nos. 2023-P-0085 and 2023-P-0086

The trial court's decision is supported by sufficient evidence and is consistent with the manifest weight of the evidence. Mothers' sole assignment of error is without merit.

{¶35} For the foregoing reasons, we affirm the decision of the Portage County Common Pleas Court, Juvenile Division.

EUGENE A. LUCCI, P.J.,

JOHN J. EKLUND, J.,

concur.

14